UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRAVIS MICHAEL ORTIZ,<br><br>Petitioner,<br><br>v.<br><br>DAVID BAUGHMAN,<br><br>Respondent. | No. 2:16-cv-0659 GEB CKD P<br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner is a California prisoner proceeding pro se with a petition for writ of habeas corpus under 28 U.S.C. § 2254. He is serving a sentence of 50 years-to-life in the California Department of Corrections and Rehabilitation imposed in Butte County on April 19, 2012 upon a conviction for first degree murder and a finding that he intentionally discharged a firearm causing death. He raises two claims challenging his conviction. For the reasons set forth below, the court recommends that the petition for writ of habeas corpus be denied.

I. Background

On direct appeal, the California Court of Appeal, Third Appellate District, summarized the facts presented at petitioner's trial and the proceedings relevant to petitioner's claims as follows:

> Bridget Castillo witnessed the murder of her boyfriend, Skhy Abrahamian, on a sidewalk on January 2, 2010, around 10:00 p.m.

1

Defendant's first trial which took place in November of 2011 ended in a mistrial when the jury deadlocked at four guilty and eight not guilty.

At the second trial, Bridget said she went with her baby that night to see the victim at the apartment of his business partner, Nick Patti. Patti was not at the apartment. Though given immunity in return for her testimony, Bridget testified she was unaware at that time that the nature of Abrahamian's and Patti's business was growing and selling marijuana.

Going to the apartment, Abrahamian was nervous due to an earlier unexpected visit from someone named "Corky," who was not defendant. Abrahamian walked Bridget to her car. Defendant – whom Bridget has known for 15 years and identified in court – drove up in a silver SUV, left it running with the lights on, got out, and wanted to talk to Abrahamian. Defendant was wearing a baseball cap backwards. Defendant and Abrahamian were members of the Norteño street gang and had business dealings together.

Defendant said, "let's go in the house." Abrahamian did not want to go inside. The two men walked away from the car, but Bridget could still see them. She was nervous because defendant was not acting normal; he was sweating and agitated. As Bridget waited in the car, she heard Abrahamian ask, "Why do you have your hands in your pocket? What's wrong?" Bridget phoned her brother Nathan, whose testimony confirmed her unease. Abrahamian came back to Bridget's car to get his house key, told her to go home, and walked away from the car.

Bridget looked down at her phone, heard a gunshot, looked up, and saw Abrahamian fall to the ground. She ran to him. Defendant just looked at her "like whatever." He put his hands underneath his sweater, but Bridget was more focused on his eyes. Defendant got in the SUV and drove off.

Because she was afraid of defendant's gang connections, Bridget lied when she initially told police that she did not know the shooter. Gang culture bans cooperating with police. That night, Bridget told her brother Nathan that defendant shot the victim, and Nathan told a third person, who called police. Bridget also told her brother that she saw the muzzle flash of defendant's gun go off, saw the victim fall to the ground, saw defendant tuck the gun away while standing over the victim and staring at her.

Nick Patti testified he was walking home when he heard the gunshot and screams from half a block away. He saw the victim's body on the ground from about 10 feet away and ran away. Patti had been walking home after running away 10 or 15 minutes earlier when defendant drove up in a silver SUV, pointed a silver revolver, yelled and threatened to "dome" Patti, i.e. shoot him in the head, if he did not get in the vehicle.

/////

Neighbors in their apartments heard the yelling and later heard the gunshot and saw a silver SUV drive away.

Upon hearing the suspect vehicle might be a silver Misubishi Montero, a police sergeant knew such a vehicle was associated with Norteño gang member Erick Lara and owned by Erick's relative Rafael Lara. The sergeant located the SUV parked outside Rafael's address. He did not check whether the hood was warm.

Based on reports the SUV might be a rental, police checked with rental companies and learned defendant was an authorized driver on a silver Pontiac Torrent SUV rented to his relative Sergio Ortiz. On January 6, 2010, police saw defendant return the Pontiac SUV to the rental office.

On January 9, 2010, police arrested defendant in his Trailblazer. He had $1,400 in cash and a stainless steel Ruger .357 Magnum revolver on the right rear passenger floorboard. The gun was loaded with five hollow point bullets.

The pathologist testified the victim was shot in the back of the head at close range, about one-and-a-half to three feet, at a slightly downward angle. He had an exit wound in his forehead. No bullet or fragments were recovered from his body. The pathologist opined the wound was made by a medium caliber bullet, approximately .9 mm., .38 mm., or .357 mm., but not .45 mm. or .22 mm.

Over defense objection, the trial court allowed the prosecution to present evidence of three uncharged offenses involving defendant.

Patti, who testified under a grant of immunity, told the jury he committed a robbery with defendant and the victim in December 2009. Defendant needed money and wanted to rob a woman with whom he dealt drugs. Defendant's brother, Scott Ortiz, arranged to have the woman bring 40 pounds of marijuana to Scott's apartment for an ostensible sale. Defendant, the victim, Nick Patti, and "Corky" waited outside. The woman drove up and sent her two "kids" (ages unknown) to knock on the door. When no one answered, they headed for the car. Defendant and Corky, each armed with a gun, stopped them. Defendant grabbed one and pushed the other, then had the two "guys" lay on the ground. Defendant and Corky grabbed the marijuana. The four cohorts went to Corky's and divided the loot. Each agreed to pay Scott $1,000 for helping set up the robbery.

Later that month, defendant visited Patti and asked to see the marijuana. Patti displayed about 20 pounds of marijuana. Defendant asked if Patti and the victim had the money to pay Scott. Patti said they were having trouble selling the marijuana because it was poor quality. Defendant asked Patti to call the victim. When Patti looked down at his phone, defendant hit him with something and knocked him out. When Patti came to, defendant was gone and so was the marijuana.

/////

3

The third uncharged offense was that, 10 or 15 minutes before killing the victim, defendant pointed a silver gun at Patti and threatened to "dome" him (shoot him in the head) if he did not get in the SUV.

The prosecution rested its case. After a recess, the prosecutor told the court he had just learned that Edward Hastings, a neighbor who saw an SUV drive away after the gunshot, had called police days after the murder to report he saw the shooter and SUV at a gas station. This was news to the prosecutor, who contacted police and was told no such report was found. Upon further inquiry, certain law enforcement officers remembered having received the information. Police obtained and viewed the gas station surveillance video, identified the person as Erick Lara, a Norteño whose relative Rafael Lara owned a silver Mitsubishi Montero. The police eliminated them as suspects. The prosecutor wrote his own report and disclosed it to defense counsel.

The police lost the video.

Hastings had not been called as a prosecution witness at the second trial. He did testify at the first trial but was not asked about the report of the SUV.

After proceedings to fashion a remedy for the government's prior failure to disclose this evidence (which we discuss *post*), the defense called Hastings as a witness. He was on his porch on the night of the shooting, drinking Hennessy's whiskey and smoking marijuana. He was "pretty drunk." He heard and saw a man in the driver's seat of a silver Mitsubishi Montero SUV yelling at a man on the curb. The street was dark, with only one streetlight, on the other side of the street. The driver was wearing a baseball cap, and Hastings did not see his face. The pedestrian jogged away, and the vehicle left. Ten or 15 minutes later, Hastings was inside his home, heard "fireworks" and screaming, looked out his window, and saw the same vehicle pull away from the curb. In the light of a passing car, Hastings caught a glimpse of the driver who was a White or light-skinned Hispanic male with a goatee, wearing a baseball cap.

Hastings was certain the Silver SUV was a Mitsubishi Montero. He thought it might be a rental, because it was clean and new. It was in better shape than a neighbor's silver Mitsubishi Montero that was parked on the street at the time of the shooting. Hastings is knowledgeable about vehicle makes and models. The police tested his talent by having him identify photos of vehicles with logos obscured. Hastings repeated the test in court, got three out of 12 wrong and offered two answers (one right and one wrong) for each of two other photos.

That night, police took Hastings to view the silver Montero associated with Norteño gang member Erick Lara. Hastings said it was similar but could not identify it as the suspect vehicle. A stipulation was read to the jury that Erick Lara, a Norteño gang member, was convicted of shooting a .38 caliber revolver at a house occupied by a Sureño gang member on May 28, 2010.

4

Two days after this murder, Hastings was at a gas station, where he saw a man who looked like the shooter. The man wore a baseball cap and was walking from an SUV to the entrance. The SUV was a Mitsubishi Montero. "[W]hen I saw the vehicle and I saw the guy, it just made me think of [the murder]." He first said he saw the man and the SUV at the same time, but when shown a document to refresh recollection, said he saw the person first. In court, Hastings learned the SUV at the gas station was the same SUV he had been unable to identify for police the night of the murder. He testified he had forgotten that the police took him to see an SUV.

In his trial testimony two years after the murder, Hastings could not say for sure if the man at the gas station was the shooter and could not remember what it was about the man at the gas station that made him think he was the shooter.

Police sergeant Rob Merrifield testified the license number reported by Hastings belonged to the Lara vehicle. Hastings reported he saw the subject and then the vehicle. Merrifield made a report turned it over to his supervisor, and has since become aware the report was never given to defense counsel. The report did not get into the police master file and was not disclosed to the district attorney's office. Merrifield found his copy in his own personal computer bank. Merrifield was surprised at not being subpoenaed to testify at prior hearings, but he kept his mouth shut.

When requested to do so, Detective James Parrott checked police logs for a record of Hastings's phone call but found nothing. The logs would not show a call made to Sergeant Merrifield's cell phone. When asked to check the logs, Parrott did not mention having watched the video because he forgot he watched the video. He looked at a photograph of Rafael Lara the morning of his testimony, and now remembered that the person on the video was Rafael Lara. Erick Lara was a passenger in the vehicle when it was stopped by police in August 2009.

Police detective Scott Harris testified he showed Hastings a photo lineup of six men, including defendant, and Hastings did not identify anyone as the shooter. Neither was Lara included in the lineup.

The jury found defendant guilty of first degree murder and found the gun enhancement allegations true.

The trial court sentenced defendant to 25 years to life for murder plus 25 years to life for personally and intentionally discharging a firearm causing death (§ 12022.53, subd. (d)). The court imposed and stayed execution of a 10 year sentence and a 20-years sentence for the other firearm enhancement (§ 12022.53, subds. (b) – (c).)

Respt's' Lodged Doc. No. 14 at 2-7.

/////

/////

5

The Court of Appeal affirmed petitioner's conviction and sentence, id. at 28, and the California Supreme Court denied petitioner's request for review of that decision. Respt's' Lodged Doc. Nos. 15 & 16.

II. Standards of Review Applicable to Habeas Corpus Claims

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.2d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following limitation on the granting of federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;
>
> or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different, as the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor,

529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011). The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

III. Petitioner's Claims

A. Delay In Disclosure Of Evidence

In his first claim, petitioner asserts that, when the prosecution revealed midway through the second trial that shortly after the murder of Skhy Abrahamian, Edward Hastings called police and reported that he believed he saw the person who shot Mr. Abrahamian and the silver SUV he was driving at a gas station, charges against him should have been dismissed.

As noted by the Court of Appeal:

> [Brady v. Maryland, 373 U.S. 83 (1963)] imposes on the prosecution a constitutional duty to disclose exculpatory information to the defense [citation omitted], including information known only to police investigators acting on the prosecution's behalf. [Kyles v. Whitley, 514 U.S. 419, 437-38 (1995)]; [California Supreme Court citation omitted]. . .
>
> To establish a *Brady* violation, a defendant must show (1) the evidence at issue is favorable to the accused, either exculpatory or impeaching; (2) the evidence was suppressed by the state, either

7

|   |   |
|---|---|
| 1 | willfully or inadvertently; and (3) prejudice must have ensued. (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282) . . . |
| 2 | |

Respt's' Lodged Doc. No. 14 at 13-14.

The Ninth Circuit has found that a <u>Brady</u> violation justifies dismissal of the indictment only in cases of "flagrant prosecutorial misconduct." <u>United States v. Williams</u>, 547 F.3d 1187, 1202 (9th Cir. 2008). The Supreme Court has never specifically addressed if and when a <u>Brady</u> violation necessitates dismissal of charges.

The Court of Appeal noted in its opinion that petitioner never sought dismissal of charges at trial. Respt's' Lodged Doc. No. 14 at 18. Further, the Court of Appeal noted that the trial court never made a finding of bad faith, as opposed to negligence, with respect to the prosecution's failure to turn over evidence and the Court of Appeal declined to make such a finding. <u>Id</u>. at 18-19.

Ultimately, the Court of Appeal found that the sanctions imposed by the trial court concerning the prosecution's failure to reveal evidence were adequate. Respt's' Lodged Doc. No. 14 at 17.

In light of the foregoing, it is clear that the Court of Appeal's rejection of petitioner's argument that the prosecution's failure to disclose evidence warranted dismissal of charges is not contrary to Supreme Court precedent and the Court of Appeal did not unreasonably apply Supreme Court precedent to the facts presented. In any case, based on the record before this court, the Court of Appeal's finding that bad faith on the part of the prosecution was not established with respect to the failure to turn over evidence is not unreasonable. For these reasons, petitioner is precluded from obtaining habeas relief on his first claim by 28 U.S.C. § 2254(d).

B. <u>Admission Of Gun</u>

As indicated above, when petitioner was arrested on January 9, 2010, he was in possession of a stainless steel Ruger .357 Magnum revolver. At trial, petitioner objected to admission of the gun into evidence, but the objection was overruled. Petitioner claims admission of the gun into evidence violated his constitutional rights by rendering his trial "fundamentally

8

unfair." The Supreme Court has held that a trial cannot be "fundamentally unfair." Williams v. Taylor, 539 U.S. 362, 375 (2000).

The California Court of Appeal rejected this claim but did not directly address it. Even so, petitioner must still show the adjudication of his claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." Richter, 562 U.S. at 98.

The United States Supreme Court has never specifically found that admission of irrelevant or overly prejudicial evidence rendered a trial in a state court fundamentally unfair. See Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009). Also, the Court of Appeal's rejection of petitioner's claim is not objectively unreasonable. As indicated by the Court of Appeal, the admission of the gun found in petitioner's car at the time he was arrested was relevant because other evidence showed that it is at least possible that the gun was the murder weapon. Respt's' Lodged Doc. No. 14 at 21-22.

For these reasons, and because the Court of Appeal's rejection of petitioner's claim is not based upon an unreasonable factual determination, petitioner's second claim is barred by 28 U.S.C. § 2254(d).

IV. Conclusion

For all of the foregoing reasons, the court will recommend that petitioner's petition for a writ of habeas corpus be denied, and this case be closed.

In accordance with the above, IT IS HEREBY RECOMMENDED that:

1. Petitioner's application for a writ of habeas corpus be denied; and

2. This case be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of

the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).  Any response to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: February 7, 2018

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

1
orti0659.157